[Cite as *State v. Smith*, 2018-Ohio-4799.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-P-0074** |
| DAVID M. SMITH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2016 CR 00186.

Judgment: Affirmed.


*Victor V. Vigluicci*, Portage County Prosecutor, and *Kristina Reilly*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Paul M. Grant*, 209 South Main Street, Eighth Floor, Suite 3, Akron, OH 44308 (For Defendant-Appellant).


THOMAS R. WRIGHT, P.J.


{¶1} Appellant, David M. Smith, appeals his convictions for attempted murder, aggravated robbery, and aggravated burglary. He challenges the denial of his motion to suppress and claims his convictions lack sufficient evidence and are contrary to the manifest weight of the evidence. We affirm.

{¶2} Smith was indicted and charged with five counts, including two counts of attempted murder, felonious assault, aggravated robbery, and aggravated burglary in March of 2016 for the beating and robbery of Quortney Tolliver.

{¶3} Following a jury trial, Smith was found guilty of one count of attempted murder, felonious assault, aggravated robbery, and aggravated burglary. The trial court determined that the attempted murder and felonious assault charges merged for sentencing.

{¶4} Smith was sentenced to a total of 22 years comprised of eleven years in prison for attempted murder, a first-degree felony in violation of R.C. 2923.02(A), 2903.02(A), and 2929.02, to run consecutively to eleven years in prison for his aggravated robbery offense, a first-degree felony in violation of R.C. 2911.01(A)(3), which is to run concurrently to another eleven years for his aggravated burglary conviction, a first-degree felony in violation of R.C. 2911.11(A)(1) and (B).

{¶5} Smith raises two assigned errors:

{¶6} "The trial court committed prejudicial error by denying appellant's motion to suppress based upon a finding that R.C. 2933.83 did not apply and thereby violating Smith's Fourth and Fourteenth Amendment rights and Article I, Section 14 of the Ohio Constitution against unreasonable searches and seizures.

{¶7} "Smith's convictions are against the manifest weight of the evidence in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, 10, & 16 of the Ohio Constitution."

{¶8} Smith first challenges the trial court's denial of his motion to suppress. He argues the victim's identification of Smith as her attacker should have been suppressed

because her identification is the result of improper police conduct that was so impermissibly suggestive that it created a substantial likelihood of misidentification and a denial of his right to due process.

{¶9} Our standard of review is mixed. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8.

{¶10} Upon challenging an identification, the defendant must first show that the police procedure was impermissibly suggestive and unnecessary. *Perry v. New Hampshire*, 565 U.S. 228, 238, 132 S.Ct. 716 (2012). If a defendant establishes that the identification was improperly suggestive, suppression is not automatic. *Id.* Instead, due process "requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" (Citations omitted.) *Id.* at 239.

{¶11} Smith asserts that Tolliver's identification of him as her attacker should have been suppressed because he was only identified as a result of the impermissibly suggestive statements and actions by Lieutenant Johnson to Tolliver. Following a hearing, the trial court denied Smith's motion to suppress and found the following in support:

3

**{¶12}** "Quortney Tolliver was assaulted in her home on October 16, 2015, and sustained life threatening head injuries. Portage County Sheriff Lt. Greg Johnson was the lead investigator assigned to the case. On November 2, 2015, Ms. Tolliver was shown four[,] six-person photo array lineups at the hospital, via blind administrator. Ms. Tolliver did not identify any of the subjects as her assailant. Defendant's photo was not included in the arrays.

**{¶13}** "During the investigation, Lt. Johnson developed a suspect through cell phone records, which indicated that defendant had communicated with Ms. Tolliver by call or text approximately 80 times within the 24 hours prior to the attack, with the last contact about 20 minutes prior to the assault. After obtaining this information, Lt. Johnson spoke to Ms. Tolliver in the presence of her mother on December 9, 2016 at the nursing facility where she was undergoing rehabilitation. Lt. Johnson showed Ms. Tolliver a single photo of defendant, explaining 'I think I know who did this to you……His name is David Smith……he knows you……' Ms. Tolliver then agreed that she had 'met him before' and 'he had given her a ride.' Although Lt. Johnson was aware that Ms. Tolliver had been trafficking in heroin, she did not admit it at the time of the interview in the presence of her mother.

**{¶14}** "Lt. Johnson again spoke to Ms. Tolliver * * * on February 29, 2016 at which time she provided a statement, identifying Defendant as her attacker.

**{¶15}** "* * *

**{¶16}** "If Defendant had been a stranger to Ms. Tolliver, and Lt. Johnson had approached her in the manner he did, the Court could find that the procedure was possibly suggestive. However, based upon the information Lt. Johnson had at the time, it was

4

evident that Ms. Tolliver was at a minimum, recently acquainted with the Defendant. Within the 24 hours prior to the attack, they had been in contact more than 80 times. It would be logical for an investigator to approach the potential identification of a suspect known to the witness in this matter, in light of the circumstances. The potential suggestibility under these facts would not give rise to a substantial likelihood of misidentification, and would not violate due process.

{¶17} "Therefore, the Court finds that Defendant's Motion to Suppress the in court and out of court identification is not well taken, and is therefore overruled."

{¶18} The trial court's factual findings are supported by the evidence presented at the suppression hearing. The evidence reveals that Quortney Tolliver was attacked in her home on October 16, 2015. She sustained severe injuries, including skull and facial fractures. She was hospitalized and in a medically induced coma for approximately two weeks.

{¶19} During her hospital stay, Tolliver was presented with several photo arrays, but did not identify any of the 24 individuals as her attacker. She was unable to speak at this time since she had a tracheal tube to aid in her breathing. Tolliver was, however, able to write and shake her head in response to questioning. She asked the detectives who did this to her. Tolliver also asked about criminal charges pending against her for drug trafficking. She told detectives in November of 2015 that she did not remember the attack.

{¶20} In December of 2015, Lieutenant Johnson visited Tolliver at the nursing facility where she was undergoing rehabilitation. Tolliver and her mother were present. Johnson recorded his meeting with Tolliver and her mother, and the audio of their meeting

was transcribed. The audio was played at the suppression hearing and the transcript was admitted as an exhibit.

{¶21} Upon entering Tolliver's room, Johnson introduced himself and immediately stated, "I think I found out who did this to you." Tolliver first asked, "who is that?" upon being shown Smith's photo, but then within seconds, she acknowledged that he is an individual who had given her a ride before.

{¶22} Johnson then told Tolliver that Smith had nothing good to say about her. She responded, "Who the fuck is he? I mean, who is he? What do you mean? I don't understand." Johnson then told Tolliver that she was text messaging Smith on the day she was attacked. Tolliver explained that Smith was supposed to give her another ride to Cleveland to visit her brother, but then Tolliver stated she still cannot remember the day she was attacked, and that she "barely remembers waking up that day."

{¶23} When Tolliver asked if Smith was in custody, Johnson responded, "not yet. He will be." Johnson then stated, "he's hoping you're dead," explaining that with Tolliver alive, Smith is "in trouble."

{¶24} Tolliver's mother asked why Smith did this, and Johnson explained that Smith said in his interview that Tolliver had a history of "ripping people off" in her illegal activities and that she had this "coming to her." Johnson then told them "he's cold hearted." "He's done prison time for attempted murder. He's got a long criminal history."

{¶25} Tolliver explained that she met Smith a few times and that she barely knew him, but that they had a mutual female friend. Tolliver had previously paid Smith $20 to take her to Cleveland, and she remembered text messaging Smith the night before for a ride. Tolliver denied that Smith was ever in her trailer.

6

{¶26} During that same meeting, Tolliver described a dream she had while she was unconscious in which Smith was at her trailer. She described him acting alone and explained, "I don't know if it was me remembering this" or a dream. She recalled getting hit with a hammer three times before going unconscious. Tolliver also remembered in her dream falling on her friend's porch after the attack. She could not say for sure if this was a dream or a memory, stating "maybe I do remember it."

{¶27} Johnson then told Tolliver that Smith's DNA was found in her bathroom sink mixed with her blood. Then Johnson advised Tolliver and her mother to keep this information to themselves because Smith left her for dead, stole from her, and rummaged through her home. Johnson told Tolliver and her mother that he "left her for dead" at least three times, and that this was "cold-blooded" twice.

{¶28} Johnson met with Tolliver again in February of 2016 and the transcript of this meeting was likewise introduced at the suppression hearing. Tolliver's memory was much clearer during this meeting.

{¶29} The night before her attack Tolliver recalled sleeping at her friend's home and then that morning she needed a ride because she had lost her license. She recalls that "D" called her, who she confirmed was Smith, and he agreed to give her a ride.

{¶30} Tolliver had known Smith about two weeks. She was expecting him that day and she recalls opening her trailer door for him. When she went to get her shoes on, Smith swung at her with a hammer. Tolliver explained that she tried to reach her taser to defend herself, but that he hit her again causing her to fall to the ground.

**{¶31}** The next thing Tolliver remembers was waking up in the hospital. She said she was unable to remember these details before stating: "Like in my coma I was having dreams, so many dreams, and that was one of them."

**{¶32}** When Johnson asked Tolliver during this February interview how certain she was that this was not a dream, she said 100 percent. Tolliver also confirmed that Smith had never before entered her trailer.

**{¶33}** Johnson testified during the suppression hearing and explained that he first suspected Smith was involved in the crimes when he learned that Smith and Tolliver had texted or called one another approximately 80 times during the 24 hours beforehand.

**{¶34}** Tolliver testified at the suppression hearing that she initially pretended not to know who the photo depicted that Johnson showed her of Smith while she was in the rehabilitation facility. She said she lied because her mother was there. Tolliver did not want to reveal in front of her mother that she was selling drugs at the time and that Smith was calling her to buy drugs. Tolliver testified that she remembered Smith attacking her before Johnson showed her his photo.

**{¶35}** Our independent review of the evidence confirms that the trial court's factual findings are supported by competent credible evidence. *Burnside*, 100 Ohio St.3d 152. Because the trial court's factual findings are supported by competent credible evidence, we conduct a do novo review of the trial court's application of the law to the facts. *Id.; State v. Ferry,* 11th Dist. Lake No. 2007-L-217, 2008-Ohio-2616, ¶11.

**{¶36}** The identification of an individual via a lineup is a critical stage in the prosecution, and the U.S. Supreme Court has held that identification procedures that are "so unnecessarily suggestive and conducive to irreparable mistaken identification"

8

constitute a denial of due process. *Stovall v. Denno,* 388 U.S. 263, 302, 87 S.Ct. 1967 (1967). Moreover, as alleged by Smith, the practice of showing a person a single suspect for purposes of identification, not part of a lineup, is widely condemned. *Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127 (1969), citing *Stovall, supra.* This practice is likewise contrary to the procedure set forth in R.C. 2933.83. However, other courts have noted that the failure to abide by the procedure in R.C. 2933.83 does not alone render the identification inadmissible. *See State v. Shaw*, 7th Dist. Mahoning No. 12 MA 95, 2013-Ohio-5292, 4 N.E.3d 406, ¶54. And we have held "[b]ecause R.C. 2933.83 governs photograph and live lineup procedures but not single photograph identification, we look to the case law for a proper analysis." *State v. Miller,* 11th Dist. Lake No. 2011-L-111, 2012-Ohio-3515, ¶37.

**{¶37}** As alleged by Smith, we agree that the identification procedure used by Johnson was impermissibly suggestive and unnecessary. Johnson made repeated disparaging statements about Smith and even said that Smith's DNA was found in Tolliver's bathroom sink mixed with her blood before Tolliver identified him as her attacker. Thus, consistent with *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375 (1972), we must assess whether the identification was reliable under the totality of the circumstances.

**{¶38}** "[T]he primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' * * * It is the likelihood of misidentification which violates a defendant's right to due process * * *. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive

9

ones are condemned for the further reason that the increased chance of misidentification is gratuitous. * * *

{¶39} "* * *

{¶40} "[T]he central question * * * [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. * * * the factors to be considered in evaluating the likelihood of misidentification include [1.] the opportunity of the witness to view the criminal at the time of the crime, [2.] the witness' degree of attention, [3.] the accuracy of the witness' prior description of the criminal, [4.] the level of certainty demonstrated by the witness at the confrontation, and [5.] the length of time between the crime and the confrontation." (Citations omitted.)  *Biggers*, *supra*, 198-200.

{¶41} The focus of the analysis is the reliability of the identification, not on the procedure used in identifying the defendant.  *Id.*

{¶42} The identification should be suppressed when the indicators of a witness' ability to make an accurate identification are "outweighed by the corrupting effect" of law enforcement suggestion.  *Manson v. Brathwaite,* 432 U.S. 98, 114-116, 97 S.Ct. 2243 (1977).

{¶43} In *Biggers*, the court noted that the only case, at that time, in which a suspect's identification by a victim was excluded on this basis was *Foster v. California*, 394 U.S. 440, 442-443 (1969).  *Id.* at 197.  The witness in *Foster* failed to identify the suspect even despite the first suggestive lineup.  Thereafter, the witness tentatively identified the suspect in a one-person confrontation between the suspect and the witness. The suspect finally positively identified Foster as "the man" in a second lineup.  Foster

was the only individual in both the first and second lineup. *Id.* Accordingly, the identification in *Foster* was excluded since it violated his right to due process because there were insufficient indicators of reliability present to outweigh the improperly obtained identification. *Foster*, at 443.

{¶44} Here, the trial court found that the circumstances showed that Johnson's procedure was "possibly suggestive," but that Tolliver's identification of Smith was not impermissibly suggestive because of her prior familiarity with him. Thus, the trial court concluded that under these facts, there was not a substantial likelihood of misidentification in violation of Smith's due process rights.

{¶45} As Smith points out, Johnson for all practical purposes told Tolliver who her attacker was and described him as cold-blooded and having a violent criminal history. Johnson also told Tolliver that Smith wanted her dead and that he thought she deserved her injuries. Johnson made these statements *before* Tolliver confirmed that Smith was her attacker.

{¶46} Smith relies on *State v. Cain*, 8th Dist. Cuyahoga No. 90425, 2008-Ohio-3674, ¶18, in support of his argument. In *Cain*, like *Foster*, the victim, Jobe, gave a physical description of his attacker, and Jobe ultimately identified an individual who was presented to him in a suggestive one-man photo "lineup," as his attacker. Jobe was 80 years old at the time of the attack, was not wearing his glasses, and described that it was very dark out at the time. He had never seen his attacker before or after the attack. His friend, who he was visiting that night and who was not present at the time of the attack, told Jobe that "this sounds like something her ex-husband would do." She brought Jobe a photo of her ex, which did not match Jobe's prior description of his attacker he had

given police. *Id.* at ¶ 10-14. Notwithstanding the differences, Jobe identified his friend's ex-husband as his attacker. *Id.* After addressing the reliability factors, *Cain* found that the identification was unreliable under the totality of the circumstances. *Id. at* ¶ 20.

{¶47} Unlike the identifications in *Cain* and *Foster*, however, Tolliver knew Smith before the attack. Moreover, Tolliver explained at the hearing that she remembered all along that Smith was her attacker, but that she did not tell Johnson and the other detectives. Most of the *Biggers* factors are better suited for addressing the reliability of the identification of an unknown suspect. Here, the fact that Tolliver knew her attacker before the crime bolsters her identification of him. "A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed." (Citations omitted.) *State v. Huff,* 145 Ohio App.3d 555, 564, 763 N.E.2d 695 (1st Dist.2001).

{¶48} Tolliver described with certainty that she had ample opportunity to view Smith at the time of her attack. She recalled Smith coming to her door, letting him in, and him striking her with a hammer. Although she said in December 2015 that she was uncertain if she was recalling a dream or the actual date of her attack, she was 100 percent certain in February 2016 and at the hearing that Smith was the person who attacked her. Thus, upon considering the totality of the circumstances surrounding the identification and the applicable factors, we disagree with Smith that her identification violates his right to due process.

{¶49} Thus, notwithstanding Johnson's improper statements about Smith to Tolliver before she "recalled" the day in question, her identification of him is nevertheless

12

reliable upon considering the applicable factors. Suppression was not required, and Smith's first assignment of error lacks merit.

{¶50} Smith's second assigned error claims his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶51} "The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. In *Thompkins,* the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. * * * The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.' * * *." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶25.

{¶52} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390, 678 N.E.2d 541. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State*

13

*v. Ellis,* 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶18, citing *Iler v. Wright,* 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶25.

**{¶53}** When an appellate court finds that a defendant's conviction is supported by the weight of the evidence, "this conclusion necessarily also includes a finding that sufficient evidence supports the conviction." *State v. Adkins,* 4th Dist. Lawrence No. 13CA17, 2014-Ohio-3389, ¶27.

**{¶54}** Smith was convicted of attempted murder, aggravated robbery, and aggravated burglary. He argues each is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree.

**{¶55}** At trial, Tolliver testified that on October 16, 2015, she was texting Smith back and forth. Smith wanted to buy crack cocaine, but she only had heroin. Tolliver knew Smith for about two weeks. He had previously driven her to Cleveland in exchange for $20 worth of crack cocaine.

**{¶56}** Tolliver said her connection from Cleveland did not deliver her drug supply, so Smith agreed to drive her there that day. She had about $500 on her to make the buy.

**{¶57}** Smith agreed to pick her up after his job interview. Tolliver recalls opening her front door for him and going to get her shoes when she "felt a hit." She said Smith hit her with a hammer and she fell to her knees. He hit her multiple times in the head, and had she not regained consciousness and exited her home, she would have died.

**{¶58}** Tolliver explained that she remembered police visiting her in the hospital, but said she could not recall them or what she said to them. She testified that she knew who had done this to her before she even woke up from her coma, but she wanted to know if the police knew who attacked her. Tolliver also said that she wanted to know how

14

the police figured out that Smith had done this to her. She explained that she wanted to "settle" the matter on her own.

**{¶59}** Tolliver also stated that even though she was already facing seven felony drug trafficking charges, which her mother knew about, she did not want to admit in front of her mother that she was still selling drugs. She also did not want to disclose her continued illegal activity to the police. Tolliver ultimately pleaded guilty to two felony counts of trafficking and received probation.

**{¶60}** Terri McDaniel, the manager of the mobile home park and Tolliver's neighbor, testified that on the morning of Tolliver's attack, he saw three cars near her trailer at approximately 10:45 a.m. No one was in the vehicles when he first saw them. McDaniel saw a woman in her fifties exit Tolliver's trailer and get into the passenger's side of a light brown car. Another woman with blonde hair was driving. He watched this car leave and go to the Walmart across the street. McDaniel then watched a black man leave Tolliver's trailer and get into an older black car. He also recalls a white male exiting her trailer and getting into a white car. McDaniel followed these two cars into downtown Kent on his way to his office. He said he saw each of these individuals exit her trailer separately.

**{¶61}** Lisa Frame testified that she and Smith were friends and that they used illegal drugs together. They were together approximately three to four days a week. She recalls him coming to her apartment one day in October 2015 when she was "dope sick" from heroin withdrawal because she had no drugs or money to buy any. Smith told Frame he had an idea to sell a gun to a friend so he could buy crack for himself and heroin for Frame. Frame drove Smith in her older black car to the mobile home park where Tolliver

15

lived, and Smith had his gun wrapped in a t-shirt or a windbreaker. Frame dropped him off and then drove three or four laps around the mobile home park while waiting for him. She waited for about 15-17 minutes. Frame did not know Tolliver and does not remember which trailer Smith approached that day. When he returned to Frame's car, she did not think he sold his gun because he still had something wrapped up in the same t-shirt or windbreaker, and Smith told her it was a "no-go," meaning he did not sell it. He returned to her car wearing the same clothes and did not appear disheveled.

{¶62} Later that same day, Frame recalls Smith having a lot of heroin, about eight grams. She knows he did not have any heroin earlier that day because he would have given her some since she was so dope sick. She has no idea where Smith got this heroin.

{¶63} Sherry Thorp also testified for the state. Thorp is a heroin and cocaine addict who has struggled with addiction for years. She is friends with Tolliver, and Tolliver sold her drugs on the morning of her attack. Thorp's sister drove her in her bronze colored car to see Tolliver at about 10 a.m. Thorp bought $20 worth of heroin and was there about five minutes. Thorp recalls Tolliver saying that she did not have any cocaine, but that she would have some later that day. She explained that Tolliver would have had a lot of money on her to purchase heroin later that day. Thorp was unsure if Tolliver's suppliers from Cleveland were delivering the drugs or if Tolliver was getting a ride to Cleveland to make the purchase.

{¶64} Tolliver's neighbor, Daniel Greathouse, testified that on the day of the attack he was sleeping in his recliner. He woke up to his dog barking and a female screaming. He got up and looked out his window and thought he saw Tolliver's daughter in his yard, but then realized it was Tolliver. He watched her walk to the trailer across the street. He

16

described Tolliver as stumbling like she was drunk and remembers seeing her pockets turned inside out. He got dressed and went across the street and waited there until the ambulance arrived.

{¶65} Lieutenant Johnson arrived at Tolliver's trailer approximately 15 minutes after the 911 call. After confirming there were no victims or suspects inside, he secured the trailer. The interior of the trailer was covered with blood, there was blood all over the bathroom sink, and a hammer was found in the kitchen.

{¶66} Tolliver's cell phone was missing. It was not on her and it was not found at the scene. Officers found no money, drugs, or jewelry in her trailer or on Tolliver. There was no sign of a forced entry.

{¶67} Johnson confirmed that Tolliver was texting someone with a 419 area code very frequently before the assault, but that the individual using this number did not call or text her after the attack. Tolliver's last phone call with the individual using the 419 number was at 11:21 a.m. This was a completed call that lasted from two-to-sixteen seconds. There were 85 contacts between Tolliver's phone and this 419 number during the 24 hours before the attack.

{¶68} Before learning that this 419 phone number was associated with David Smith, Johnson learned from BCI that one of the DNA swabs from Tolliver's bathroom tested positive as preliminarily associated with Smith. Johnson went to Smith's apartment, who voluntarily spoke with him. Smith told Johnson he had heard about the attack, and he denied ever being inside Tolliver's home. Smith confirmed his phone number was the 419 number that had numerous contacts with Tolliver's phone during the 24 hours before the attack.

17

**{¶69}** Johnson also obtained a copy of Smith's employment application submitted on the day of Tolliver's attack with his fiancée's employer. Smith provided this same 419 phone number as his contact number.

**{¶70}** Johnson relayed the information he received from Tolliver's and Smith's cell phone carriers at trial. Smith's phone carrier's records showed that on October 16, 2015, between 11:46 a.m. and 11:52 a.m., his cell phone number registered on a cell phone tower located on the same road where Tolliver's attack occurred and that was 1,738 feet from her trailer.

**{¶71}** Johnson explained that Tolliver was reluctant in helping law enforcement because she was a drug trafficker, who was concerned about repercussions from being a snitch. She was also out on bond on her trafficking case at the time of the attack and was still selling.

**{¶72}** Tolliver's lawyer contacted Johnson after Tolliver was out of rehabilitation and after she was sentenced for her trafficking offenses. Tolliver was 100 percent certain that Smith was the person who attacked her with a hammer.

**{¶73}** Johnson also relayed that Tolliver's phone records showed that she had a two-minute phone call at 11:31 a.m., and that someone first called 911 at 11:59 a.m. Thus, the attack happened during this interval.

**{¶74}** Following her attack, Tolliver was missing her platinum teeth overlay or her "grill," her purse, her cell phones, and wallet. Tolliver told Johnson that she had between $500 to $600 in her pocket. Her pockets were inside out when she arrived at the emergency room.

**{¶75}** After the attack, Florence Fontello, an inmate at the Portage County Jail was a passenger in a car with her boyfriend at the time, a girl from West Virginia, and David Smith. She overheard her boyfriend, Randy, ask Smith about what happened to a girl named "Q." Fontello heard Smith respond that he "got that bitch with a hammer." She identified Smith in the courtroom. Randy also asked Smith something like "what he got from Q," but Fontello did not hear Smith's response, if any. Fontello agreed on cross-examination that she had four or five felony convictions, and she also admitted to previously saying that Randy was lying about what Smith said in the car that day. However, Fontello explained that she was "on the run" at the time and did not want to be involved. She did not tell Lieutenant Johnson what she knew because she was afraid.

**{¶76}** Smith's fiancée, Margaret Austin, testified for the defense. On October 16, 2015, Austin arrived at work early, before 7:00 a.m., and she called Smith to tell him that her company was hiring part-time employees and that he should come there right away to submit an application. Her phone records show that the two were calling and texting one another frequently that morning. Austin testified that Smith came to her job, submitted his application, and brought her lunch. She said he sat with her during her 20-minute lunch break, from approximately 11:27-11:46 a.m.

**{¶77}** Austin's co-worker, Robin Layne, testified that she always took her lunch first at 11 a.m., before Austin, since Layne is a diabetic. She and Austin each had a 20-minute lunch period that they could not take at the same time. On the day in question, Layne remembers Austin saying that Smith was bringing her lunch and coming to put in his application. When Layne's lunch was over at approximately 11:20 a.m., Smith was not there yet because Austin was still waiting for Smith to bring her food. Layne explained

that when Smith had come in the past, he would poke his head into the plant. This day, however, she did not see Smith.

{¶78} R.C. 2903.02(A), murder, prohibits a person from, "purposely caus[ing] the death of another * * *." R.C. 2923.02(A) "attempt" prohibits a person from "purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶79} Tolliver's testimony provides sufficient evidence that Smith attacked and beat her at least three times in the head with a hammer. She sustained life threatening injuries and was in a coma for two weeks. Her trailer was covered with blood, and had she not exited her home to get help, she would have died from her injuries.

{¶80} Smith does not challenge any specific aspect of his attempted murder conviction as lacking support. Instead, he relies on the testimony of his fiancée at the time, who testified that Smith was with her during her lunch hour at the time Tolliver was beaten and robbed, as showing he did not commit the offenses. However, upon considering this conflicting testimony, the jury, as the trier of fact, obviously did not believe Austin's testimony, but believed the testimony of Tolliver and Johnson. We do not disagree with the jury's resolution of this conflicting testimony, and as such, find Smith's attempted murder conviction supported by sufficient evidence and not against the manifest weight of the evidence.

{¶81} As for Smith's aggravated robbery conviction, R.C. 2911.01(A)(3) prohibits:

20

**{¶82}** "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

**{¶83}** "* * *

**{¶84}** "(3) Inflict, or attempt to inflict, serious physical harm on another."

**{¶85}** Smith argues the state failed to come forward with any evidence that anything of value was taken from Tolliver's trailer on the morning she was attacked. Smith also claims there was no testimony that Tolliver had anything of value in her trailer and that the state failed to come forward with any evidence supporting this element of the aggravated robbery offense. We disagree.

**{¶86}** Tolliver testified that she had about $500 on her at the time of her attack to purchase drugs, and because Smith was going to drive her to Cleveland to purchase crack cocaine, the jury could infer that he knew she had a substantial amount of cash on her at the time.

**{¶87}** Johnson testified that Tolliver's cash, drugs, purse, wallet, and platinum "grill" were missing after the attack. And Tolliver's neighbor recalled that Tolliver's pockets were turned inside out when they found her bleeding and collapsed on a neighbor's wheelchair ramp. Thus, Smith's aggravated robbery conviction is likewise supported by sufficient evidence and is not against the manifest weight of the evidence.

**{¶88}** Finally, Smith was also convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), which prohibits:

**{¶89}** "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied

21

structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

**{¶90}** "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

**{¶91}** "* * *

**{¶92}** "(B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree."

**{¶93}** Here, Smith challenges his aggravated burglary conviction as contrary to the evidence because the state never proved that he trespassed in her trailer. Smith contends that he did not enter her trailer that day and did not commit these offenses. Notwithstanding his denial, he asserts the evidence shows that Tolliver invited him into her trailer on the date of the attack, and thus, there was no evidence of a "trespass," as that term is commonly defined.

**{¶94}** However, the Ohio Supreme Court has found that sufficient evidence of a "trespass" exists even when evidence shows that the defendant initially entered the victim's home with permission, finding, "even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the victim's] parents' home terminated the moment he commenced his assault on her." *State v. Steffen,* 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987); *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir.2008) (holding that privilege to remain on premises ended when defendant strangled the victim); *State v. Foster*, 8th Dist. Cuyahoga No. 85790, 2005-Ohio-5716,

2005 WL 2807354, ¶45 (finding defendant's "privilege to remain on the premises was revoked due to his armed attack of violence against" the resident).

{¶95} Thus, because Smith's permission to be present in Tolliver's home ceased to exist when he struck her in the head with a hammer, we find sufficient evidence of trespass thereafter to support his aggravated burglary conviction. Smith's aggravated burglary conviction was established via sufficient evidence and is not against the manifest weight.

{¶96} Accordingly, Smith's second assigned error lacks merit and is overruled.

{¶97} The trial court's decision is affirmed.

CYNTHIA WESTCOTT RICE, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶98} I respectfully dissent from the majority's decision to affirm the denial of the motion to suppress the identification of Smith. The identification procedure utilized by the police in this case was improperly suggestive and was the exact method that creates a very substantial likelihood of irreparable misidentification, which is prohibited by law and violates due process. Such a violation cannot be tolerated in such a serious case, especially where the likelihood of misidentification was extremely high.

{¶99} There is no question that the procedure utilized here, presenting one photograph to a victim while repeatedly making statements that the man depicted is a

23

criminal and implying or outright portraying him as committing the crime, is of the type that is "widely condemned," which the majority admits. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199; *State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988). Using a single photograph is suggestive and especially unnecessary where there are "no exigent circumstances and a photo array could easily have been prepared and presented * * *." *State v. Padgett*, 2d Dist. Greene No. 99 CA 87, 2000 WL 873218, *3 (June 30, 2000).

{¶100} Here, the victim initially repeatedly denied knowing who attacked her. Subsequently, Lieutenant Johnson presented her with a single photo of Smith, initiating the conversation by stating "I think I found out who did this to you" and then noting Smith's name. The victim explained that she had met Smith before and he had given her a ride. Lieutenant Johnson then stated that "he's hoping you're dead," "he's cold hearted," "he's done prison time for attempted murder," and has a "long criminal history." As the conversation continued and the victim's mother questioned whether Smith was a violent person, Lieutenant Johnson stated "he's very violent." The victim then stated she had a dream that Smith walked into her home and hit her with a hammer. Lieutenant Johnson replied that Smith "doesn't have any sympathy for you," "feels that you probably deserved to have this happen," and "left [the victim] for dead."

{¶101} Only *after* this interview did the victim finally identify Smith as the assailant. The procedure implemented by Lieutenant Johnson essentially amounted to telling the victim that Smith was the attacker and could hardly have been more suggestive. The entire interview, read in context, reveals that the tone was one of persuasion, convincing

24

the victim that Smith was the type of man who would commit such a crime and describing the facts of the crime with the assumption that he did indeed commit it.

{¶102} The majority recognizes that the identification procedure utilized here was "impermissibly suggestive and unnecessary." *Supra* at ¶ 37. Given the foregoing, including the repeated attempts to paint Smith in a negative light and describe him as the attacker, this is an understatement. "Eyewitness evidence derived from suggestive circumstances * * * is uniquely resistant to the ordinary tests of the adversary process. An eyewitness who has made an identification often becomes convinced of its accuracy." *Perry v. New Hampshire*, 565 U.S. 228, 252, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). "The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime" since "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent * * * courtroom identification." *Simmons v. United States*, 390 U.S. 377, 383-384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

{¶103} Given the extreme skepticism and disdain with which the law views suggestive identification procedures, it is necessary that this court evaluates attempts to redeem the identification with a critical eye. The majority concludes, however, that the impermissible conduct in the identification has no consequences since the victim was ultimately familiar with Smith and confidently identified him subsequent to the inappropriate identification procedure.

{¶104} The totality of the circumstances test in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), applied by the majority, however, weighs heavily

against permitting the admission of the identification. While an overly suggestive identification process can be saved by a showing of reliability, this is the type of case where reliability is a major concern. The factors primarily relate to the accuracy of the witness's perception of the offender and the certainty of her identification. The victim here failed to recall or identify the perpetrator repeatedly and did so only *after* being convinced that he committed the crime. Her ability to view and observe Smith at the time of the crime, if he committed it, is questionable, given the victim's own statements that she could not remember the crime initially and was having dream-like recollections. The victim had recently suffered major brain trauma requiring extended hospitalization, was residing in a nursing home, and had been unable to speak for a period of time, rendering her likely to be more suggestible. The fact that the victim was initially unsure of her attacker's identity but then later became "100 percent certain" weighs against the intention of the *Biggers*' factor relating to the closeness in time of the identification, since the time that passed from the commission of the crime until the victim became "certain" spanned multiple months. The victim was entirely inconsistent in her recollection of events and, it is noteworthy that in selling drugs, she frequently had many individuals coming in and out of her home, including on the day of the attack.

{¶105} The Eighth District in *State v. Cain*, 8th Dist. Cuyahoga No. 90425, 2008-Ohio-3674, found that a suggestive identification procedure used when the victim had suffered a head injury resulted in an identification that was unreliable under the totality of the circumstances. *Id.* at ¶ 19-20. Further, to the extent that it is argued the victim knew Smith, the fact that she had met Smith once for a short period of time does not impact the foregoing grounds for finding her identification unreliable. This is the type of factual

26

situation where the reliability of the identification is squarely at issue. If the improper identification procedure used here is permissible, it stands to reason that it could be found acceptable in almost any case.

{¶106} Finally, it is entirely unclear why the police in this case could not have followed the proper procedure and, at the least, presented a photo array. This procedure is clearly set forth in R.C. 2933.83, which notes the failure to follow the steps provided subjects the State to claims of eyewitness misidentification. The actions taken here, if permitted, would negate the requirement to use any of the procedures that have been created to prevent mistaken convictions and identifications.

{¶107} For the foregoing reasons, since the overly suggestive identification procedure utilized was improper and the victim's identification was entirely unreliable, it was necessary to grant the motion to suppress to avoid the serious possibility of misidentification. I respectfully dissent.