NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0333n.06

No. 23-3604

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DAVID M. SMITH, | ) | |
| Petitioner-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE NORTHERN DISTRICT OF OHIO |
| CYNTHIA DAVIS, Warden, | ) ) | |
| Respondent-Appellee. | ) ) ) | OPINION |

Before: COLE, CLAY, and THAPAR, Circuit Judges.

CLAY, J., delivered the opinion of the court in which COLE, J., joined. THAPAR, J. (pp. 27–35), delivered a separate dissenting opinion.

**CLAY, Circuit Judge**. While investigating the beating and robbery of Quortney Tolliver, a law enforcement officer presented her with a single photograph of Petitioner David Smith and told her that he committed the crime, that he had been previously convicted for attempted murder, and that he wanted her dead. Although Tolliver did not identify Smith as her assailant at the time, she did positively identify him several months later. Based on the corruptive influence of law enforcement's unduly suggestive procedures on Tolliver, Smith filed a motion to suppress Tolliver's identification of him as her assailant. The trial court denied Smith's motion. After being presented with Tolliver's eyewitness identification during trial, a jury convicted Smith of attempted murder, felonious assault, aggravated robbery, and aggravated burglary.

Following a direct appeal of the trial court's suppression ruling and exhaustion of his state court options, Smith filed a petition for a writ of habeas corpus in federal court, pursuant to

28 U.S.C. § 2254. Smith now appeals from the district court's denial of his habeas petition. For the reasons set forth below, Smith is entitled to relief on his claim that his due process rights were violated by the admission of Tolliver's identification. The identification was obtained through unduly suggestive means conducive to irreparable mistaken identification, and lacked any strong indicia of reliability. Because the Ohio Court of Appeals unreasonably applied Supreme Court precedent related to eyewitness identifications, we **REVERSE** the judgment of the district court and **GRANT** Smith's federal habeas petition, meaning that Smith is entitled to a new trial.

## I.    BACKGROUND

### A.  Factual Background

On October 16, 2015, Quortney Tolliver was attacked with a hammer in her mobile home in Portage County, Ohio. For approximately two weeks after the incident, Tolliver was hospitalized and placed in a medically-induced coma due to the severity of her head injuries. As soon as Tolliver regained consciousness, law enforcement began to interview her to glean what she remembered—if anything—from the day of her attack. These interviews, occurring in November 2015, December 2015, and February 2016, are the subject of the suppression motion on appeal.

The police first attempted to speak with Tolliver on November 2, 2015, approximately two weeks after the attack. At the time, Tolliver was limited in her communication due to her injuries and could not verbalize audibly. Communicating through hand signals and writing, Tolliver reviewed a photo array of 24 black men. These sets of photos did not include one of Smith, who was not yet a suspect, and Tolliver did not signal that she recognized any of the individuals from the array. When the police asked if Tolliver had any memory about the incident that occurred on October 16, 2015, she replied that she had none. At this time, Tolliver also wrote a note to her

mother that stated, "who did this to me?" There was no indication at this initial interview that Tolliver knew who assaulted her.

Once Tolliver's recovery progressed, the police met with her for a second time on December 9, 2015 "to confirm the identity of a person that [they] had identified as the suspect in the incident." Tr. Suppression Hr'g, R. 10-1, Page ID #761. Smith had become the lead suspect, as his DNA was found to be preliminarily associated with the DNA found mixed with Tolliver's blood in the trailer.[1] Lieutenant Greg Johnson, Chief of Detectives of the Portage County Sheriff's Office, conducted the interview with Tolliver and surreptitiously recorded the conversation. Tolliver's mother was also present for this conversation.

Upon entering Tolliver's room, Johnson declared that he "found out who did this to [her]." *Id.* at Page ID #768. Using a large photograph of Smith, Johnson then told Tolliver that the person was David Smith and asked if she recognized him. Tolliver did not recognize the man in the photo and asked, "who is that?" *Id.* at Page ID #825. She eventually admitted that she had met Smith at least once before and vaguely knew him through a mutual friend. However, Tolliver did not suggest that the man in the photo could be her assailant. Undeterred, Johnson then began to paint a disparaging picture of Smith, stating that he had already interviewed Smith, and Smith did not "have anything good to say about [Tolliver]." *Id.* at Page ID #771. At that point, Tolliver stated

---

[1] Preliminary association is not conclusive evidence that Smith's DNA was in the trailer; instead, information derived from mere genetic associations is used by law enforcement only as an investigative lead. In fact, the officer that received this information, Lieutenant Greg Johnson, was warned that preliminary notifications about DNA are "not intended to replace the forensic laboratory's reported document" because "an additional DNA sample . . . must be obtained for verification by the forensic laboratory." Tr. Suppression Hr'g, R. 10-1, Page ID #780. Johnson agreed that the preliminary association was far from conclusive, yet he presented the information to Tolliver as though Smith's DNA was definitively linked to her trailer.

that she recalled that Smith was supposed to give her a ride to Cleveland the morning of the attack but still could not remember the day itself, waking up that day, or any details of the incident.

Still determined to obtain some form of a positive identification from Tolliver, Johnson proceeded to tell Tolliver that Smith wanted her dead and had previously done time in prison for attempted murder. He further described Smith as "very violent" and "cold-hearted," explaining that Smith believed Tolliver deserved to be attacked and that he had left Tolliver to die. *Id.* at Page ID #772, 774. When disparagement was not enough to convince Tolliver that Smith committed the crime, Johnson also told Tolliver that they found Smith's DNA inside of her mobile home and that Smith, in a prior interview, denied ever being in the home. Johnson then said, "how the heck did [Smith's] DNA get in there unless the DNA fairy [placed it in there], and there's no such thing as a DNA fairy." *Id.* at Page ID #778. As Johnson continued to elaborate on the evidence that he had uncovered purportedly linking Smith to the crime, he even stated that "there's some things I'm going to tell you, [and there's] some things I can't because I don't want this to have a bad effect on the trial." *Id.* at Page ID #772. Johnson concluded the interview by assuring Tolliver that he was going to get Smith arrested and would let her know right away when he did so. Overall, Johnson did not merely *suggest* that Smith was the perpetrator, but rather explicitly *informed* Tolliver several times that Smith committed the crime and tried to kill her.[2]

Despite Johnson's relentless attempts to secure a positive identification from Tolliver, she maintained throughout the interview that she barely knew Smith, had no problems with Smith, and could not remember the day of the attack at all. Although, towards the end of the conversation,

---

[2] Even Johnson himself admitted during the suppression hearing that, instead of allowing Tolliver to identify the witness herself, he explicitly told her that Smith was the person who attempted to murder her with a hammer.

Tolliver eventually admitted that she had a dream that a bald black man maced her[3] and then assaulted her with a hammer, she still did not identify Smith as her assailant and continued to represent that she did not remember October 16, 2015. And importantly, Tolliver did not mention any dream until Johnson had already shown her a photograph of Smith, identified Smith as a convicted felon with a history of attempted murder, and emphatically asserted to her that Smith committed the crime.

Nearly three months later, the next conversation took place on February 29, 2016, soon after Tolliver was sentenced to probation in her own drug trafficking case. During this conversation, Tolliver claimed for the first time that she was now "one hundred percent sure" that, after replaying the dream in her head, her dream accurately reflected the attack. *Id.* at Page ID #798, 812. Tolliver explained that Smith was supposed to come over that morning to take her to Cleveland for a drug deal, so Smith had to be her assailant. For the first time, Tolliver stated that she actually knew all along that Smith was the perpetrator.

## B. Procedural History

Prior to trial, Smith moved to suppress "any eyewitness identification and testimony by Qourtney Tolliver identifying Defendant out of court and in-court as her assailant on October 16, 2015." Mot. to Suppress, R. 7-1, Page ID #109. Smith argued that Johnson's actions were so impermissibly suggestive that there was a substantial risk of his misidentification. Even in the state court proceedings, the government admitted that showing a single picture to a person for the

---

[3] There was no evidence either during the investigation or at trial that mace was ever deployed during the attack on Tolliver. And, based on the suppression hearing transcript, it is unclear whether Tolliver's dream was specifically about Smith or a man who merely looked like Smith. *See* Tr. Suppression Hr'g, R. 10-1, Page ID #805–06, 832. Further, Tolliver had "so many dreams," and this dream involving mace was "one of them." *Id.* at Page ID #805.

purpose of identification "has been widely condemned." Pl.'s Br. In Opposition to Suppression, R. 7-1, Page ID #131. The state court agreed to hold a hearing on the motion on July 15, 2016.

At the suppression hearing, the various law enforcement officers involved in the interviews with Tolliver testified. Additionally, Tolliver herself took the stand. She explained that she texted and called Smith on October 16, 2015, looking for a ride to Cleveland to get some drugs. This testimony directly contradicted an earlier statement of Tolliver, recalling that Smith initiated contact on October 16, 2015 by calling her first. Regarding the December 9, 2015 interview, Tolliver stated that she misled Johnson and actually knew exactly who was depicted in the photo. She testified that she lied to prevent her mother, who was in the room during the conversation, from knowing that she was dealing drugs.[4] Tolliver maintained throughout the suppression hearing that, despite the Johnson's suggestive commentary, her conclusions about Smith eventually came from her own dreams and independent recollection.

Based on the suppression hearing and following the parties' subsequent briefing, the trial court denied Smith's motion to suppress. The trial court found that Johnson's presentation of Smith's photo was unproblematic. Specifically, the trial court claimed that because Smith was not a stranger to Tolliver, Johnson's identification procedures were not suggestive, as "[i]t would be logical for an investigator to approach the potential identification of a suspect known to the witness in this manner." Judgment Entry, R. 7-1, Page ID #167. On appeal, the Ohio appellate court recognized that this holding was erroneous and properly found that the identification procedure

---

[4] During the December 9, 2015 conversation at which her mother was present, Tolliver stated that she had briefly met Smith through a mutual friend, and that Smith had driven her to Cleveland once to see her brother. Therefore, she did not have to reveal her drug dealing activities in order to state that she recognized Smith and remembered that Smith was her attacker. Yet Tolliver maintained that she did not remember the day of the incident.

used by Johnson was impermissibly suggestive and unnecessary. Indeed, "Johnson made repeated disparaging statements about Smith and even said that Smith's DNA was found in Tolliver's bathroom sink mixed with her blood before Tolliver identified him as her attacker." *State v. Smith*, 2018-Ohio-4799, 2018 WL 6313398, at \*4 (Ohio Ct. App. Dec. 3, 2018). Based on this finding, the Ohio Court of Appeals attempted to salvage the trial court's patently incorrect conclusion by analyzing whether the identification was nonetheless reliable under "the totality of the circumstances." *Id.* at \*5–\*6.

In evaluating the reliability of Tolliver's identification, the Ohio appellate court highlighted that "[a] strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed." *Id.* at \*6 (quoting *State v. Huff*, 763 N.E.2d 695, 702 (Ohio Ct. App. 2001)). The court noted that most of the *Neil v. Biggers*, 409 U.S. 188 (1972) factors are "better suited for addressing the reliability of the identification of an unknown suspect," and that, by contrast, Smith was known to Tolliver. *Id.* The court then went on to credit that Tolliver stated in February 2016 that she was 100% certain that Smith was the person who attacked her. *Id.* The court also recognized that Tolliver "recalled Smith coming to her door, letting him in, and him striking her with a hammer." *Id.* Based on this incomplete evaluation of the *Biggers* factors coupled with Tolliver's prior awareness of Smith, the Ohio Court of Appeals held that "notwithstanding Johnson's improper statements about Smith to Tolliver before she 'recalled' the day in question, her identification of him is nevertheless reliable." *Id.*

Judge Grendell of the Ohio Court of Appeals dissented, reasoning that the improperly suggestive identification procedure resulted in a completely unreliable identification. *Id.* at \*11–\*13. Tolliver failed to identify Smith on multiple occasions and could eventually do so only after being pressured by Johnson. *Id.* at \*12. Presumably, as a result of having suffered major brain

7

trauma, Tolliver was highly susceptible to believing and adopting Johnson's theories. *Id.* Further, Tolliver only became "certain" about the perpetrator of the crime many months after the incident occurred. *Id.* Overall, "[t]he victim was entirely inconsistent in her recollection of events." *Id.* Judge Grendell therefore would have held that the totality of the circumstances test in *Biggers* weighed heavily in favor of suppression. *Id.*

After the Ohio appellate court's ruling, Smith timely appealed to the Ohio Supreme Court, which declined to exercise jurisdiction. On February 26, 2020, Smith applied for a writ of habeas corpus, asserting seven grounds for relief. After reviewing and adopting the recommendations of the assigned magistrate judge, the district court denied the petition and granted Smith a certificate of appealability related to his claim that the trial court erred in denying his motion to suppress Tolliver's identification.

## II. STANDARD OF REVIEW

A district court's denial of a habeas petition is reviewed *de novo*. *Mitchell v. MacLaren*, 933 F.3d 526, 531 (6th Cir. 2019). Because Smith's suppression claim was adjudicated on the merits in the state court proceedings, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's review. In accordance with 28 U.S.C. § 2254(d), a state court adjudication on the merits cannot be overturned unless it "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Haliym v. Mitchell*, 492 F.3d 680, 690 (6th Cir. 2007); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000). Because Smith does not meaningfully argue that the Ohio Court of Appeals based its reliability analysis on an unreasonable determination of the facts, we may

properly focus our analysis on § 2254(d)(1)—whether the Ohio Court of Appeals decision was contrary to or unreasonably applied Supreme Court precedent.

A state court decision is "contrary to" established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Haliym*, 492 F.3d at 690 (alterations omitted) (quoting *Williams*, 529 U.S. at 412–13). And a state court decision may be considered to have "unreasonably appli[ed]" federal law where the decision identifies the correct governing legal principle but "unreasonably applie[s] that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S. at 413). The state court's ruling must be such an "extreme malfunction" that no reasonable jurist could deem it consistent with Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011). As applicable to this case, Supreme Court precedent mandates that courts weigh the reliability of an identification against the suggestiveness of law enforcement's identification procedure. *See Biggers*, 409 U.S. at 198–99 (delineating the two-part framework governing identifications); *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (directing courts to balance the suggestive procedure against the totality of the circumstances related to reliability); *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (holding that, where the unduly suggestive procedure outweighs the indicia of reliability, the identification must be suppressed). Based on these clearly established standards, the Ohio courts unreasonably applied federal law by failing to weigh the lack of reliability of Tolliver's identification against the highly suggestive and coercive procedure.

## III.    ANALYSIS

Smith argues that the Ohio courts misapplied constitutional law surrounding suggestive identifications and that Tolliver's unreliable identification should have been suppressed.

The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *see also Foster v. California*, 394 U.S. 440, 442 (1969). To ascertain whether an identification should be suppressed, a court utilizes a two-step evaluation. *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009). In the first step, it evaluates "whether the procedure was unduly suggestive." *Id.* If the identification procedure is deemed unduly suggestive, then, in the second step, it "uses five factors set out in *Neil v. Biggers* to evaluate 'the totality of the circumstances to determine whether the identification was nevertheless reliable.'" *Id.* (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1071 (6th Cir. 1994)).

## A. Johnson's Unnecessarily Suggestive Confrontation Procedures

The first step involves determining whether the procedure the police used was unduly suggestive. As explained above, neither party disputes that Johnson's confrontation procedures—which involved the use of an unnecessarily suggestive single photograph display—were impermissible. Indeed, a single photo display "has been widely condemned," *Stovall*, 388 U.S. at 302, because it "present[s] greater risks of mistaken identification than a lineup," *Moore v. Illinois*, 434 U.S. 220, 229 (1977). The Supreme Court has routinely and repeatedly cast doubt upon the showing of a single photo of a single suspect to a victim of a crime because of the high likelihood of misidentification. *See Manson*, 432 U.S. at 109 (agreeing that the police procedure was suggestive and unnecessary because only one photo was used in the absence of exigent circumstances); *Simmons v. United States*, 390 U.S. 377, 383 (1968) (explaining that the chance of misidentification is heightened where the police display to the witness only a single photograph

of the individual or state that they have other evidence that the individual pictured committed the crime); *Biggers*, 409 U.S. at 199–200 (holding that the police's use of a showup was unnecessarily suggestive and evaluating the reliability of the victim's identification); *Biggers v. Tennessee*, 390 U.S. 404, 407 (1968) (Douglas, J., dissenting) ("[S]howing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police suspect this man.").

In this case, merely referring to Johnson's procedures as "impermissibly suggestive" is a gross understatement, given the manipulative nature of Johnson's tactics that "includ[ed] repeated attempts to paint Smith in a negative light and describe him as the attacker." *Smith*, 2018 WL 6313398, at *12 (Grendell, J., dissenting); *see also* Mag. J. R&R, R. 26, Page ID #2986 ("Unquestionably, such statements are likely to influence any victim—but especially one who exhibited memory loss after a head injury—to identify Mr. Smith as the attacker."). And it is not as if this coercive procedure was the police's only option. As Judge Grendell's dissent pointed out, "it is entirely unclear why the police in this case could not have followed the proper procedure and, at the least, presented a photo array." *Smith*, 2018 WL 6313398, at *13 (Grendell, J., dissenting).

Accordingly, on one side of the balancing scale is a pre-trial identification procedure that vastly exceeds what the Supreme Court has previously viewed as "unnecessarily suggestive." This was not merely the suggestive presentation of a single photo, *Manson*, 432 U.S. at 108; an improper lineup where the main suspect stuck out like a sore thumb, *Foster*, 394 U.S. at 443; or an unnecessary "showup," *Biggers*, 409 U.S. at 195.[5] Instead, this was a suggestive single photo

---

[5] "Showups" involve the police displaying a single suspect to a witness. Unlike lineups or photo arrays, "showups are inherently suggestive and are criticized by scholars and courts because displaying a single person to a witness both suggests to the witness that the person is guilty and fails to test whether the witness can independently identify the person." J.P. Christian Milde, *Bare*

display *coupled with* an unbridled attempt to disparage a suspect and to persuade the victim to identify him. Johnson did not merely "suggest" that Smith was the perpetrator—he explicitly advised Tolliver that Smith brutalized her with a hammer, pitted Tolliver against Smith, and exaggerated every piece of preliminary evidence he had uncovered purporting to tie Smith to the crime. Accordingly, Supreme Court precedent demands that only an extremely strong showing of reliability could overcome Johnson's aberrant, highly corruptive procedure. *Perry*, 565 U.S. at 239 ("Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." (quoting *Manson*, 432 U.S. at 116)).

### B. The Reliability of Tolliver's Identification

Because Smith easily succeeds on the first step, this Court's analysis is principally focused on reviewing the state appellate court's application of the second step of the evaluation—determining whether Tolliver's identification of Smith was otherwise reliable. When an identification was unduly suggestive, a court turns to the five factors set out in *Neil v. Biggers* to evaluate "the totality of the circumstances to determine whether the identification was nevertheless reliable." *Ledbetter*, 35 F.3d at 1071. The five *Biggers* factors include:

(1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the witness' degree of attention;
(3) the accuracy of the witness' prior description of the criminal;
(4) the level of certainty demonstrated by the witness at the confrontation; and
(5) the length of time between the crime and the confrontation.

---

*Necessity: Simplifying the Standard for Admitting Showup Identifications*, 60 BOS. COLL. L. REV. 1771, 1774 (June 2019).

409 U.S. at 199–200.[6]  This totality of the circumstances test should be applied on a case-by-case basis.  *Id.* at 196; *see also Manson*, 432 U.S. at 110 (noting that evaluating the totality of the circumstances "limit[s] the societal costs imposed by a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact"); *Perry* 565 U.S. at 239.

In *Biggers*, the Supreme Court held that an unnecessarily suggestive showup resulting in an identification of the defendant was nevertheless reliable and admissible because:  (1) the victim spent up to half an hour with her assailant; (2) her original description of the perpetrator's general features corresponded with the defendant's features; (3) she had no doubt that defendant was the person who raped her; and (4) she testified that the defendant's face was something she could never forget.  *Biggers*, 409 U.S. at 200–01.  Using these factors, the Supreme Court held that the several indicators of the witness' ability to reliably identify the defendant outweighed the corrupting effect of the showup.  And where the strong showing of reliability prevailed, the Supreme Court held that the admission of the pre-trial identification did not violate the defendant's due process rights.

---

[6] Scholars and lawyers alike have identified the need for the Supreme Court to revisit these five factors, as only two are scientifically correlated to a witness' accuracy in identifying the perpetrator—how well the witness was able to view the perpetrator and the length of time between the initial observation and the identification procedure.  Indeed, a witness' level of confidence largely does not correlate with reliability at all.  *See, e.g.*, Milde, *supra* note 5, at 1776 n.25; Suzannah B. Gambell, *The Need to Revisit the* Neil v. Biggers *Factors*, 6 WYO. L. REV. 189, 202 (2006); *Haliym*, 492 F.3d at 705 n.15 (collecting various articles and studies that illustrate "empirical evidence on eyewitness identification undercuts the hypothesis that there is a strong correlation between certainty and accuracy"); *Perry*, 565 U.S. at 263–65 (Sotomayor, J., dissenting) (collecting studies that show that eyewitness misidentification is the "single greatest cause of wrongful convictions in this country").

A faithful application of the *Biggers* factors to this case demands a different outcome. Applying the *Biggers* factors here, as the state courts largely failed to do, the factors overwhelmingly illustrate that Tolliver's identification should have been suppressed. The first factor—the opportunity of the witness to view the defendant during the crime—clearly favors suppression. Unlike *Biggers*, in which the victim had ample opportunity to view her assailant (up to thirty minutes), Tolliver testified that she "was so busy" that she simply pushed at the handle of the screen door, immediately turned away to get her coat and shoes, and was hit by a hammer. Pl.'s Br. In Opposition to Suppression, R. 7-1, Page ID #128, 132. She turned back around to reach for her Taser, but was hit again and blacked out. At most, she had a few seconds to view her assailant through the obstruction of a screen door which, under previous identification cases, is not enough to confer reliability. *Cf. Manson*, 432 U.S. at 114 (finding that the first factor favored a reliability finding where the witness had two to three minutes to view assailant and opened the door for him twice, looking him directly in the eyes and having a short conversation); *Simmons*, 390 U.S. at 383 (noting that improper employment of photographs by police may cause witnesses to err in identifying criminals, particularly where the witness "obtained only a brief glimpse of a criminal, or [saw] him under poor conditions"); *Haliym*, 492 F.3d at 705 (witness viewed the suspect at a close range for the duration of the attack and testified that he saw his mother stabbed thirty times); *Howard v. Bouchard*, 405 F.3d 459, 472 (6th Cir. 2005) (witness had three opportunities to view the perpetrator, and one of those opportunities was for more than a minute); *Mills*, 572 F.3d at 251 (witness had considerable time to observe the perpetrator where the events lasted more than an hour).

The second factor—the witness' degree of attention—favors suppression for the same reasons. *Cf. Ojile v. Smith*, 779 F. App'x 288, 294 (6th Cir. 2019) (noting the second *Biggers*

factor weighed against reliability because the witness only viewed the perpetrator during a single brief observation while under the influence of stress or excitement). Tolliver was not focused on the assailant behind the screen door, but rather she was "busy" and focused on gathering her coat and shoes. In fact, Tolliver told Johnson that she "did not pay attention to if [the person at the door] pulled up or not." Pl.'s Br. In Opposition to Suppression, R. 7-1, Page ID #132. And after the assailant hit her, she was concentrating on obtaining a self defense weapon, her Taser on the counter. In contrast to other cases in which witnesses faced and focused on their assailants, the nature of Tolliver's assault illustrates that she could not pay the requisite attention to weigh in favor of reliability. *Cf. United States v. Crews*, 445 U.S. 463, 473 n.18 (1980) (attaching particular significance to the fact that the victim viewed her assailant at close range for a period of five to ten minutes under excellent lighting conditions and "with no distractions"); *Biggers*, 409 U.S. at 200 (noting that victim faced her rapist "directly and intimately," as "[s]he was no casual observer, but rather the victim of one of the most personally humiliating of all crimes").

The third factor—the accuracy of the witness' prior description of the defendant—also weighs against reliability. We have previously held that "[t]he purpose of looking to prior identifications is to find an indicium of reliability. If [the witness] failed to describe [the suspect] before being presented with his photo in a suggestive manner, that fact should not be ignored, but rather cuts in favor of [defendant's] argument that [the witness] identified him merely because of the suggestive photo line up." *United States v. Crozier*, 259 F.3d 503, 512 (6th Cir. 2001). The lack of any description prior to the confrontation therefore supports Smith's argument that Tolliver identified him merely because of the suggestive photo. At best, this factor is inapplicable here, where Tolliver never provided a description of her assailant and initially claimed to not remember the attack at all. *Cf. Haliym*, 492 F.3d at 705 ("The third factor [is] inapposite. Nothing in the

15

record suggests that [the witness] provided a description of the suspect to the police prior to the line-up.").

The fourth factor—the level of certainty shown by the witness at the pretrial identification—can cut both ways. Even after being told that Smith committed the crime, Tolliver *continued* to express hesitancy and could not discern her dreams from reality. The Supreme Court has required an evaluation of the "level of certainty demonstrated by the witness at the confrontation." *Biggers*, 409 U.S. at 199; *see also United States v. Washam*, 468 F. App'x 568, 577–78 (6th Cir. 2012) (Clay, J., dissenting) (explaining that the district court mishandled the fourth factor "when it allowed the [witness'] changed testimony to trump their initial identifications," as the *Biggers* factor pertains to the level of certainty *at the time of confrontation*); *Crozier*, 259 F.3d at 512 (finding an indicium of reliability where the witnesses picked the defendant as the robber "within five seconds of viewing the photo line-up"). Measuring confidence from the time of confrontation is imperative, as suggestive remarks from law enforcement consistently inflate eyewitness certainty.[7] The record reflects that Tolliver exhibited an extremely low level of certainty during Johnson's initial confrontation, as she failed to identify Smith as her attacker, and switched from stating "who is that" to admitting that she had briefly met Smith through a mutual friend.

---

[7] Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures & the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 LAW & HUM. BEHAV. 1, 12 (Feb. 2009) ("The problem with using eyewitness certainty as a second-prong reliability factor in *Manson*-type situations is that it has already been determined (under the first prong) that a suggestive procedure was used with this eyewitness. As with view and attention, we know that confirmatory suggestive remarks from the lineup administrator consistently inflate eyewitness certainty for eyewitnesses who are in fact mistaken." (collecting studies)).

However, approximately two months later, Tolliver changed her mind and stated that she was 100% certain that her assailant was Smith. *See Manson*, 432 U.S. at 115 (finding a high level of certainty where the witness testified at the time of confrontation that there "is no question whatsoever" about the identification). But, again, the relevant time interval is the time of confrontation, not at a subsequent trial or a later hearing. *See Biggers*, 409 U.S. at 199; *Washam*, 468 F. App'x at 578 (Clay, J., dissenting) ("A witness' level of certainty [after the time of confrontation], especially after the identified individual has been arrested and indicted, is not part of the *Biggers'* analysis."). Although Tolliver provided an explanation for her prior hesitation and testified during the suppression hearing with a high level of certainty that would normally support reliability, such a finding must be one of only tempered strength, as Tolliver exhibited an utter lack of confidence at the time of confrontation. And this purported confidence should be further tempered by the fact that this fourth factor is frequently criticized as one that rarely correlates with the reliability of a witness' identification.[8]

Finally, the fifth factor—the length of time between the initial observation and the identification—slightly favors suppression, as approximately four months passed before Tolliver could identify Smith as the aggressor.[9] *See Biggers*, 409 U.S. at 201 (expressing concern about

---

[8] "Confidence by the witness in an eyewitness identification has been shown to be of little significance to accuracy." Gambell, *supra* note 6, at 202 (collecting studies); *see also Perry*, 565 U.S. at 264 (Sotomayor, J., dissenting) (recognizing "confidence is a poor gauge of accuracy"). And, what's more, "witness confidence of an identification increases with time instead of decreasing." Gambell, *supra* note 6, at 202.

[9] Scientific studies consistently show that recognition may be extremely high immediately following an event, but then fades quickly. For example, one study found that a witness' recognition of a photograph after two hours was 100%, while after four months deteriorated to 57%. *See* Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil & Criminal* § 3-2 (3d ed. 1997). In addition, the passage of time also can create changes in how the witness

17

the lapse of seven months between the crime and the confrontation and noting that this "would be a seriously negative factor in most cases"); *Manson*, 432 U.S. at 116 (photographic identification took place only two days later, and the Supreme Court highlighted that "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph"); *id.* at 131 (Marshall, J., dissenting) ("[T]he fact is that the greatest memory loss occurs within hours after an event . . . [i]f the time gap is any greater, reliability necessarily decreases."); *United States v. McCrary*, No. 1:18-cr-26, 2018 WL 3575053, at *9 (S.D. Ohio July 25, 2018) ("There was no time lag of hours, days, or months, to hinder the [witness'] memory and thwart a positive identification."); *Crozier*, 259 F.3d at 512 (agreeing that the length of time cut in favor of suppression where "[o]ne month had passed between the robbery and the impermissibly suggestive photographic line up"). Although the Sixth Circuit has upheld similar time periods of multiple months where other strong indicia of reliability existed, this case clearly does not involve a strong showing on any of the other *Biggers* factors to mitigate against the fifth factor's weak showing. *See, e.g.*, *Howard*, 405 F.3d at 473 (finding that three months is not an excessive length of time where witness provided a prior accurate description, had ample opportunity to view the perpetrator, exhibited a high degree of attention, and exhibited confidence by immediately picking the defendant out of a lineup); *United States v. Causey*, 834 F.2d 1277, 1285 (6th Cir. 1987) (finding

---

remembers the original event based on information acquired well after the witnessing event has occurred. This phenomenon is referred to as "post-event influence." For example, one study found that "after witnessing a clean-shaven person commit an act, participant-witnesses who were given information suggesting that he had a moustache incorporated that information into their later descriptions of the person." Wells & Quinlivan, *supra* note 7, at 14. Where Johnson engaged in highly influential and overbearing tactics to convince Tolliver that Smith was her attacker, her recollection is unquestionably susceptible to law enforcement's information affecting her later reports.

that three months was not an excessive length of time where witness could clearly see the perpetrator and provided an unequivocal and very accurate description of the defendant).

On balance, no fair-minded jurist could possibly find that the totality of the *Biggers* factors cut in favor of admitting Tolliver's largely unreliable identification. But the Ohio courts swept this severe weakness under the rug, either by failing to analyze the Supreme Court's factors altogether or by cursorily citing *Biggers* and halfheartedly devoting a couple of sentences to its analysis. Nonetheless, we must examine all theories that could have supported the state court's conclusion. Because the Supreme Court has permitted a review of the "totality of the circumstances," the state court is also arguably permitted to evaluate case-specific factors that may not fit cleanly into the delineated *Biggers* factors. *Cf. Perry*, 565 U.S. at 239 n.5. In this case, the Ohio Court of Appeals relied heavily upon the fact that Tolliver knew Smith before the crime, explaining that a strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed. *Cf. Haliym*, 492 F.3d at 706 (noting that "[w]itnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification").

However, the Ohio Court of Appeals failed to recognize that Tolliver had only seen Smith *one single day* in the past. Tolliver testified during the suppression hearing that she did not know Smith well, she only knew him "just as well as [she] knew everybody else." Tr. Suppression Hr'g, R. 10-1, Page ID #819. Every case in this Circuit that has allowed a witness' prior knowledge of a suspect to contribute to the reliability of the identification involved a significantly closer relationship than that of Tolliver and Smith. *Cf. Moss v. Hofbauer*, 286 F.3d 851, 862 (6th Cir. 2002) (finding identification reliable where the witness had previously seen the suspect on a daily

19

basis as a neighbor); *Crozier*, 259 F.3d at 511 n.2 (explaining that familiarity should operate as a sliding scale factor, because "the more familiar the person, the more reliable the identification"); *Haliym*, 492 F.3d at 706 (highlighting that the witness knew the suspect from four previous occasions); *United States v. Beverly*, 369 F.3d 516, 539 (6th Cir. 2004) (witness knew suspect "very well" and "would readily recognize" him, as the suspect was the witness' husband); *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir. 1980) (holding that a trial court did not abuse its discretion by permitting identification testimony of defendant's stepfather who recognized the defendant in a bank surveillance photo); *Bryant v. Turner*, No. 2:15-cv-02929, 2016 WL 5930919, at *8 (S.D. Ohio Oct. 12, 2016) (witness could readily identify the suspect, who was his cousin). The facts in this case are unquestionably distinguishable. In contrast to a showing of a close relationship, a few weeks prior to the incident, Tolliver asked her friend, Christina Yeager, for a ride home from a court date. When Yeager arrived to pick up Tolliver, Smith was driving the car. The trio then dropped Tolliver's paperwork at her trailer and took Tolliver to Cleveland to purchase drugs. This single day was the first and only time that Tolliver had met Smith, making their incipient acquaintanceship, at best, a minimal contributor to the reliability analysis. Our precedent has never deemed such a tenuous relationship close enough to confer reliability in the *Biggers* analysis.

Importantly, in addition to Smith and Tolliver's relationship being easily distinguishable from prior case law, every single case that allowed a prior acquaintanceship to color the reliability analysis also involved a strong showing of the *Biggers* factors. In other words, the totality of the circumstances evaluation mandates that at least a majority of the *Biggers* factors cut in favor of a finding of reliability, and only then can prior knowledge of the suspect bolster the reliability evaluation. *Cf. Haliym*, 492 F.3d at 705 (finding sufficient reliability where, in addition to several

prior face-to-face meetings, the totality of the circumstances included a strong showing of (1) a good opportunity to view the suspect, (2) a heightened degree of attention where witness was fixated upon the commission of the crime and communicated with the attacker, and (3) a short period of a few days between the confrontation and the identification). But, as stated above, no such *Biggers* showing was or could be made here. And one or two brief face-to-face meetings cannot overcome the overwhelming lack of reliability indicated by a proper weighing of the *Biggers* factors.

The Ohio Court of Appeals also credited Tolliver's testimony that she remembered all along that Smith was her attacker, as well as her claim that did not identify him in December 2015 because she did not want her mother to know that she was still dealing drugs.[10] This explanation makes little sense, as she eventually told Johnson that Smith had driven her one time to Cleveland "to see her brother." Tr. Suppression Hr'g, R. 10-1, Page ID #803–04. In other words, Tolliver had already offered an innocent explanation for her limited knowledge of Smith that would have allowed her to identify Smith as her attacker without revealing that she was trafficking drugs. Yet she continued to deny that she remembered the day in question or that Smith was her assailant. Even putting the obvious weaknesses of this February 2016 explanation to the side, an eleventh-hour explanation cannot save the totality of the circumstances evaluation where the vast majority of the *Biggers* factors weigh in favor of suppression. *Cf. Kyles v. Whitley*, 514 U.S. 419, 444 (1995) (noting that adjustments to a witness' original story "can be fatal to its reliability").

---

[10] Although the dissent erroneously attempts to highlight and credit Tolliver's second explanation for her supposed dishonesty—that she did not want to affect her pending drug cases—the district court did not have this information before it when ruling on Smith's motion to suppress. At the time of the ruling at issue, the district court only heard testimony related to Tolliver's alleged wariness of her mother's presence during her conversation with Johnson.

Finally, it is worth mentioning that the Ohio Court of Appeals' opinion suffers from a glaring omission in its totality of the circumstances evaluation—that Tolliver had suffered serious brain trauma prior to the unnecessarily suggestive confrontation procedure, which likely rendered her more susceptible to suggestion and negatively affected several of the *Biggers* prongs. *See Smith*, 2018 WL 6313398, at \*12 (Grendell, J., dissenting); *see also* Jerrod Brown, *Interview Considerations – Traumatic Brain Injury*, INT'L ASS'N CHIEFS OF POLICE (Nov. 9, 2022) (explaining that traumatic brain injuries may increase the risk of suggestibility, rendering a witness more vulnerable to providing the response that they believe the authority figure wants to hear rather than stating the truth). In addition to her vulnerable mental state, the chance of misidentification increases further where the police indicate to the witness that they have other evidence linking the person pictured to the crime. Heightened suggestibility, coupled with Johnson's encouragement to deem Smith as the perpetrator, has been scientifically linked to confabulation—the development of false memories. *See, e.g.*, Demothenes Lorandos, *Adult Suggestibility*, 2 LITIG. HANDBOOK FORENSIC MED., PSYCHIATRY, & PSYCH. § 10:12 (May 2023) (collecting studies illustrating that photos and suggestion can create false memories over time, including a study that found that "confirmatory feedback increased false memory for forcibly confabulated events, increased confidence in those false memories, and increased the likelihood that participants would freely report the confabulated events 1 to 2 months later"). The Supreme Court has explicitly recognized that, in these circumstances, "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent . . . identification." *Simmons*, 390 U.S. at 383–84.

In summary, the state court's cursory reliability analysis hung its hat on the fact that Tolliver had met Smith on one occasion prior to the assault and, months after the original

confrontation with his photo where she was unable to identify him, newly proclaimed that she was 100% certain that Smith was her attacker. Beyond this extremely weak showing of reliability, the state court then failed to balance these minimal showings against the immensely suggestive law enforcement procedure. *Manson*, 432 U.S. at 114, 116. Instead of being merely presented with a photograph, Tolliver was told exactly who committed the crime, what evidence law enforcement had to support Smith's arrest, and that the suspect subsequently threatened and disparaged her. Faced with such powerful suggestions and evidence, it should be no surprise that she identified Smith with newly discovered confidence as her assailant months later. And the totality of the circumstances test mandated by the Supreme Court to probe the reliability of Tolliver's subsequent identification overwhelmingly points in favor of suppression. Where eyewitness identifications rank among the most compelling evidence available to a jury and are the leading cause of wrongful convictions, such an unreliable identification should never have been presented at trial. The state court's failure to suppress this identification testimony was an objectively unreasonable application of Supreme Court precedent, thus clearing the highly deferential bar imposed by AEDPA. *Cf. Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003) (where a state court's decision reaches a result not supported by Supreme Court precedent, "[t]he requirements of § 2254(d) [] pose no bar to granting petitioner habeas relief").

## C. The Ohio Court's Unreasonable Application of Supreme Court Precedent

The manifest injustice in this case stems from the Ohio trial court's erroneous original decision that Johnson's interview procedures, which indisputably ran afoul of Supreme Court and Sixth Circuit precedent, were warranted and not overly suggestive. Following this error, the Ohio Court of Appeals attempted to cobble together some semblance of a faithful application of the law regarding the reliability of Tolliver's identification. Without engaging in any meaningful analysis

23

of the *Biggers* factors—perhaps because the *Biggers* factors overwhelmingly favored suppression—and instead relying upon Tolliver's nascent acquaintanceship with Smith, the Ohio court completely failed to salvage the trial court's erroneous reasoning.[11] Ultimately, Smith's due process claim is not barred by § 2254, inasmuch as the Ohio court unreasonably applied Supreme Court precedent in evaluating the reliability of Tolliver's identification. 28 U.S.C. § 2254(d)(1); *Harrington*, 562 U.S. at 102–03.

Although "deference and latitude" must be afforded to the state court in accordance with AEDPA, fair-minded jurists could not disagree that the scant indicia of reliability in this case simply cannot outweigh the egregious and highly influential identification procedure utilized by Johnson. In direct contravention of the Supreme Court's holding in *Foster*, Johnson's coercive and suggestive tactics "made it all but inevitable that [the victim] would identify petitioner whether or not he was in fact 'the man.'" *Foster*, 394 U.S. at 443. And, even worse than the identification procedure utilized in *Foster*, the police disparaged Smith to Tolliver, intentionally painting a picture of a repeat offender who had served time for attempted murder and wanted Tolliver dead.

---

[11] The dissent criticizes us for "fault[ing] the state court for not conducting a detailed, factor-by-factor *Biggers* analysis" and for providing our own analysis of the factors. Dissent at 32. But rather than rubber stamping the state court's constitutionally deficient decision under the guise of federalism or comity, AEDPA requires us to determine whether the state court's conclusion rested upon an objectively unreasonable application of Supreme Court precedent. We can only make such a determination by examining the facts before us in light of the relevant clearly established law. *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. . . . A federal court can disagree with a state court's . . . determination and, when guided by AEDPA, conclude the decision was unreasonable."); *Harrington*, 562 U.S. at 91 ("Judges must be vigilant and independent in reviewing petitions for the writ.").

While the dissent attempts to brush aside the clear application of *Foster* based on immaterial factual differences, "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)); *Caver v. Straub*, 349 F.3d 340, 350 n.7 (6th Cir. 2003) (explaining that, for the purposes of § 2254(d)(1), a Supreme Court rule "must be applied in the many factually distinct situations that will come before the lower courts"). Under the dissent's interpretation of the AEDPA bar, federal courts could never rectify even the most obvious, egregious constitutional errors, as a conniving lawyer can always contrive a factual distinction. But AEDPA does not require perfect congruence, and applying the dissent's insurmountable test to this case would be especially perverse, given that the facts of this case vastly *exceed* the gravity of the constitutional violation the Supreme Court found in *Foster*.

When the enormous weight of this improper identification procedure is balanced against the dubious traces of Tolliver's reliability, any fair-minded juror would conclude that the scale crashes to the side demanding suppression. Accordingly, the Ohio courts' failure to engage in the balancing test mandated by clearly established Supreme Court precedent resulted in the objectively unreasonable admission of eyewitness evidence that jurors view as disproportionately compelling. *Manson*, 432 U.S. at 114, 116; *Perry*, 565 U.S. at 239. Prompted by coercive suggestiveness and riddled with internal inconsistencies, Tolliver's identification nonetheless served as the key piece of the government's evidence—this error is exactly the "extreme malfunction in the state criminal justice system" that federal habeas corpus is intended to correct. *Harrington*, 562 U.S. at 102.

25

## IV.    CONCLUSION

Smith was convicted based on an unduly suggestive and coercive single photo identification procedure intended to elicit a positive identification from a victim who had just suffered a severe and debilitating head trauma.  Ohio courts impermissibly excused this flagrant violation of Smith's right to due process.  Not even AEDPA deference can insulate such an unreasonable application of Supreme Court precedent from proper review and reversal.  For the foregoing reasons, we **REVERSE** the district court's denial of the writ of habeas corpus, and **REMAND** with instructions that the district court issue Smith a writ of habeas corpus unless the State proceeds, within 180 days, to prosecute Smith in a new trial without utilizing Tolliver's identification of Smith, which shall be suppressed and excluded from evidence.

THAPAR, Circuit Judge, dissenting. David Smith seeks a writ of habeas corpus. He argues police improperly influenced a witness to identify him as the perpetrator, and he claims the state trial court should have suppressed the witness's identification. The Ohio Court of Appeals held the identification was reliable and rejected Smith's claim. The majority disagrees with the merits of that analysis. But under AEDPA, a disagreement with a state court isn't enough to grant relief. Indeed, "even serious errors aren't enough to warrant relief by themselves." *James v. Corrigan*, 85 F.4th 392, 393 (6th Cir. 2023). Rather, we may grant habeas only if the state court caused an "extreme malfunction" of the justice system by unreasonably applying clearly established Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Here, the state court's decision was reasonable, so Smith isn't entitled to habeas relief.

I.

David Smith wanted to buy crack and heroin from Quortney Tolliver. Tolliver's supply had run out. But Smith was persistent. After texting or calling her more than eighty times, the pair finally agreed that Smith would drive Tolliver to Cleveland so she could restock. In exchange, Tolliver would give Smith a deal on the drugs. The plan seemed good enough: in fact, Smith had driven Tolliver to Cleveland in exchange for drugs two weeks earlier.

Things didn't go as smoothly this time. When Smith was close to Tolliver's trailer, he called to confirm she was ready. Tolliver said she was. So Smith walked up to the trailer, and Tolliver opened the door and went to get her shoes. But as she turned, Smith pulled out a hammer and hit her in the head. Tolliver collapsed. Smith hit her again, took her drug money, and left her for dead.

Tolliver was taken to the hospital, where she fell into a weeks-long coma. When she woke up, police came to interview her. Tolliver still couldn't speak due to her injury, so she wrote her

responses, and her mom read them to the police. Officers showed Tolliver twenty-four photos and asked her to identify the assailant. Smith wasn't included in the array, and Tolliver didn't identify any of the individuals who were. Officers asked if Tolliver remembered the incident. She signaled no.

A month later, Lieutenant Greg Johnson visited Tolliver. She was in a nursing home, accompanied by her mother. Johnson introduced himself and told Tolliver, "I think I found out who did this to you." R. 10-1, Pg. ID 768. He showed Tolliver a photo of Smith. At first, Tolliver asked, "Who is that?" *Id.* at 825. Seconds later, she confirmed that she recognized Smith, that Smith had given her a ride before, and that he was supposed to take her to Cleveland the day she was attacked. Johnson then stated that Smith's DNA was found in Tolliver's trailer. He also said Smith is "very violent" and "hoping you're dead." *Id.* at 771–72. Sometime during the interview, Tolliver told Johnson she dreamt—or remembered, she wasn't sure which—that Smith hit her with a hammer.

Weeks later—four-and-a-half months after the attack—Tolliver was sentenced on separate drug charges. She asked Lieutenant Johnson to meet her immediately after the sentencing. When Johnson arrived, Tolliver said she remembered the incident and knew Smith attacked her. Johnson asked whether Tolliver was sure this wasn't a dream. Tolliver confirmed she was "one hundred percent sure." *Id.* at 798. Why hadn't she shared this during the earlier interview? According to Tolliver, she didn't want her mom to learn she was selling drugs. And she didn't want her admission to affect her then-pending drug charges.

Eventually, Ohio charged Smith with attempted murder, aggravated robbery, and other crimes. Before trial, Smith moved to suppress Tolliver's identification, arguing Lieutenant

Johnson was unnecessarily suggestive when interviewing her. The state trial court denied the motion, and a jury found Smith guilty.

On appeal, Smith argued the court shouldn't have admitted Tolliver's identification. The Ohio Court of Appeals held that Lieutenant Johnson was unnecessarily suggestive when interviewing Tolliver. *State v. Smith*, 2018-Ohio-4799, ¶ 37 (Ohio Ct. App. Dec. 3, 2018). But, applying Supreme Court precedent, the court concluded that Tolliver's identification was sufficiently reliable and didn't need to be suppressed. *Id.* ¶¶ 38–49 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). When Smith raised this claim in a federal habeas petition, the district court agreed with the Ohio court's analysis and denied relief. *Smith v. Eppinger*, No. 20-CV-00438 (JPC), 2023 WL 4071835 (N.D. Ohio June 20, 2023).

II.

When police use "unnecessarily suggestive" tactics to secure a witness identification, due process limits the government's ability to introduce that identification at trial. *Biggers*, 409 U.S. at 198. Here, the Ohio Court of Appeals held that Lt. Johnson's procedures were unnecessarily suggestive. *Smith*, 2018-Ohio-4799, ¶ 37. But not all unnecessarily suggestive identifications must be suppressed. *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). If an identification has "sufficient aspects of reliability," it may be admitted. *Id.* Indeed, suppressing a reliable identification—even one that was obtained through unnecessarily suggestive procedures—would be a "draconian sanction" that "may frustrate rather than promote justice." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (quoting *Manson*, 432 U.S. at 113). The Supreme Court has identified five factors—called the *Biggers* factors—that help determine whether an identification is reliable. *Biggers*, 409 U.S. at 199–200. If a witness had ample opportunity to see the criminal, was paying attention during the crime, and identified the defendant soon after, her

identification is more reliable. *Id.* On the other hand, if the witness is uncertain of her testimony, or if she failed to accurately describe the defendant until after the suggestive interview, the identification is less reliable. *Id.* Throughout it all, the "central question" is whether, "under the 'totality of the circumstances,'" the identification was reliable even though police were unduly suggestive. *Id.* at 199; *see also Perry*, 565 U.S. at 239 & n.5 (2012) (suggesting the five factors aren't exhaustive).

The Ohio Court of Appeals applied *Biggers* and held that Tolliver's identification was reliable. *Smith*, 2018-Ohio-4799, ¶¶ 38–49 (citing *Biggers*, 409 U.S. at 199). Accordingly, it rejected Smith's suppression claim. *Id.* ¶ 49. The majority holds that the state court's decision unreasonably applied Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). In doing so, the majority misapplies "the deferential standard of review demanded by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Shoop v. Cunningham*, 143 S. Ct. 37, 37 (2022) (Thomas, J., dissenting from denial of certiorari).

A.

Where (as here) the state court applies the correct governing law to the facts, our review is extremely limited. *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam). To show that the Ohio Court of Appeals' decision was an "unreasonable application" of *Biggers*, Smith must do more than establish that the state decision was wrong. *Harrington*, 562 U.S. at 101–03. He must also show that the decision was such an "extreme malfunction[]" of the justice system that every fair-minded jurist would conclude it contradicted *Biggers*. *Id.* at 102.

Smith doesn't clear this high bar. The Ohio Court of Appeals reasonably concluded that Tolliver's identification was reliable. As the state court emphasized, Tolliver knew Smith before the attack. *Smith*, 2018-Ohio-4799, ¶¶ 47, 67. Smith had previously driven her to Cleveland, and

the pair communicated more than 80 times the day before the attack. *Id.* That "substantially increases" the reliability of Tolliver's identification. *Haliym v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007). Moreover, Tolliver had ample opportunity to see Smith and was paying attention to him before the attack. *See Biggers*, 409 U.S. at 199. Indeed, she was expecting Smith, opened the door for him, and turned to get her shoes to leave with him. *Smith*, 2018-Ohio-4799, ¶¶ 30, 48. Thus, it makes sense that Tolliver was "one hundred percent sure" Smith attacked her. R. 10-1, Pg. ID 798; *see Biggers*, 409 U.S. at 199. Finally, although Tolliver failed to identify Smith until months after the incident—and initially said she didn't remember the attack—the court reasonably credited her explanation for the delay and shift: she didn't want her mom to learn she was selling Smith drugs, and she didn't want the testimony to affect her pending drug charges. *Smith*, 2018-Ohio-4799, ¶¶ 34, 48, 59; *see Biggers*, 409 U.S. at 199. Given these facts, it wasn't an "extreme malfunction" for the court to conclude that Tolliver's identification was reliable.

B.

So how does the majority conclude otherwise? By declining to apply AEDPA's deferential standard of review. Instead, the majority conducts its own *de novo* analysis of the *Biggers* factors and then states that no fair-minded jurist could disagree with its conclusion. Majority Op. 14–19 (applying the five *Biggers* factors and then appending a sentence stating that "no fair-minded jurist could possibly find that the totality of the *Biggers* factors" supported Tolliver's identification). Again and again, the Supreme Court has rejected this exact approach. *Shinn*, 592 U.S. at 119 (holding that a reviewing court may not "essentially evaluate[] the merits *de novo*, only tacking on a perfunctory statement at the end of its analysis asserting that the state court's decision was unreasonable" (quoting *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018))); *Harrington*, 562 U.S.

31

at 101–02 (similar). The majority pursues that precise approach today despite the Supreme Court's unambiguous prohibition.

The majority then tries to show the state court's analysis was more than just wrong. But those efforts come up short.

First, the majority faults the state court for not conducting a detailed, factor-by-factor *Biggers* analysis. It says the state court "largely failed" to apply *Biggers* by "halfheartedly devoting a couple sentences to its analysis" or by "failing to analyze the Supreme Court's factors altogether." Majority Op. 14, 19. But the Ohio Court of Appeals cited and quoted extensively from *Biggers*, laid out its factors, and analyzed its "central question": whether Tolliver's identification was reliable under the totality of the circumstances. *Smith*, 2018-Ohio-4799, ¶¶ 37–49 (citing *Biggers* and considering "the applicable factors"). It "strains credulity" to believe the court refused to apply a test "it had taken the trouble to recite." *Early v. Packer*, 537 U.S. 3, 9 (2002) (per curiam). More fundamentally, the majority errs by targeting the state court's reasoning rather than its bottom-line decision. It doesn't matter how many sentences the state court used to conduct its *Biggers* analysis. *Rogers v. Mays*, 69 F.4th 381, 391–92 (6th Cir. 2023) (en banc), *cert. denied sub nom. Rogers v. Pounds*, 144 S. Ct. 830 (2024). We review the state court's "decision," not the comprehensiveness of its reasoning. *Id*. Indeed, the majority's analysis disregards the Supreme Court's reminder that we "have no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300–01 (2013). The Ohio Court of Appeals didn't need to offer *any* explanation for its decision—let alone a multi-paragraph discussion of each *Biggers* factor. *See Harrington*, 562 U.S. at 98.

Second, the majority criticizes the state court for emphasizing that Tolliver had known Smith before he attacked her. According to the majority, one previous interaction isn't enough to

confer reliability. At most, then, we're left with a disagreement between the state court and the majority about how to weigh evidence. So who wins? Under AEDPA, the answer is clear: we defer to the state court when no clearly established Supreme Court precedent stands in the way. 28 U.S.C. § 2254(d)(1); *see Harrington*, 562 U.S. at 102 (asking whether the arguments supporting a state court's decision clearly contradict "the holding in a prior decision of [the Supreme] Court"). And here, the majority can't find a single Supreme Court case holding that a court can't consider the victim's previous interaction with her attacker in its reliability analysis. *See* Majority Op. 19–20. There is no such case. And it's impossible to conclude that state court a misapplied a "clearly established" Supreme Court precedent when no such precedent exists. 28 U.S.C. § 2254(d)(1).

Moreover, our circuit previously held that a victim's prior acquaintance with her attacker is relevant to the reliability analysis. *Haliym*, 492 F.3d at 706 ("[A]ny prior acquaintance with another person substantially increases the likelihood of an accurate identification.").[1] In assessing whether Tolliver's prior acquaintance with Smith made her identification more reliable, the state court wasn't unreasonable for taking the same view as our own circuit precedent.

Finally, the majority argues that the state court's application of *Biggers* was unreasonable because it resulted in a decision that contravened *Foster v. California.* 394 U.S. 440 (1969). But a fair-minded jurist could conclude that *Foster* is distinguishable and doesn't dictate the outcome

---

[1] The majority contends that relying on a victim's prior knowledge of the suspect is only allowed if a majority of the *Biggers* factors already support reliability. Majority Op. 20–21. Even if this were an accurate statement of our circuit precedent, which it's not, the majority points to no Supreme Court case holding as much. On the contrary, Supreme Court precedent allows courts to consider facts that fall outside the *Biggers* factors—as the majority itself acknowledges. Majority Op. 19 ("Because the Supreme Court has permitted a review of the totality of the circumstances, the state court is also arguably permitted to evaluate case-specific factors that may not fit cleanly into the delineated *Biggers* factors." (internal quotation omitted)).

here. In that case, a witness saw a tall man in a leather jacket rob a bank. 394 U.S. at 441. Police later asked the witness to identify the robber from a lineup of three people. However, only the defendant was wearing a leather jacket, and the other two men were half a foot shorter. *Id.* When that didn't work, police allowed the witness to talk one-on-one with the defendant. *Id.* When that still didn't work, police showed the witness a five-person lineup. Of the five participants, only the defendant had appeared in the earlier lineup. *Id.* at 441–42. As a result, the witness identified the defendant as the robber. *Id.* at 442. But because the officers' tactics made it "virtually inevitable" the witness would pick the defendant, the Court suppressed the identification. *Id.* at 443.

True, as the majority points out, the identification procedures used here were not a model of police behavior. The police said negative things about Smith to Tolliver and showed Tolliver Smith's picture. For its part, the state court transparently acknowledged these procedural defects. However, as the state court recognized, there is a crucial difference between Smith's case and *Foster*: unlike the victim in *Foster*, Tolliver had been acquainted with her attacker (Smith) before the attack occurred. That makes Tolliver's identification more reliable than the identification in *Foster*. *See Haliym*, 492 F.3d at 706 ("[A]ny prior acquaintance with another person substantially increases the likelihood of an accurate identification."); *see also United States v. Crozier*, 259 F.3d 503, 511 & n.2 (6th Cir. 2001) (similar). The state court rested on this distinction and held that the identification was reliable because of Tolliver's prior acquaintance with Smith. Again, merely disagreeing with that determination isn't grounds on which we may grant habeas. The point of AEDPA is to leave all but the most indisputably obvious legal questions to the judgment of state courts, subject to direct appeal, and out of the hands of federal courts on collateral review. Entertaining the merits of debatable legal questions on collateral review disregards the respect for federalism that Congress has mandated. Because the Ohio Court of Appeals' decision to consider

34

prior acquaintance didn't directly contradict any holding of the Supreme Court, it wasn't unreasonable for the Ohio Court of Appeals to conclude Tolliver's identification was more reliable than the one in *Foster*.

\*　　\*　　\*

I would affirm the district court's decision.  For that reason, I respectfully dissent.